# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

RICHARD GREEN,          )
                                )
      Petitioner,        )
                                )
      vs.             )     Case number 4:04cv0610 CEJ
                                )                     TCM
TROY STEELE[1] and      )
JEREMIAH W. NIXON,    )
                                )
      Respondents.    )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The 28 U.S.C. § 2254 petition of Richard Green, a Missouri prisoner, for federal habeas corpus relief is before the undersigned United States Magistrate Judge for a review and a recommended disposition. See 28 U.S.C. § 636(b).

### Background

Richard Green ("Petitioner") was convicted following a jury trial in June 1998 of two counts of forcible rape, two counts of armed criminal action, and two counts of kidnaping. (Resp. Ex. B at 79-84.) His defense had been misidentification by the two victims, a twelve-year old girl, A.L., and a seventeen-old girl, M.O., and an alibi of being at home with his girlfriend. (Resp. Ex. A at 249, 267-69.) Trial counsel also informed the jury in his opening statements that Petitioner would explain at trial some seemingly damaging comments he had made to his employer. (Id. at 268-69.)

_____

[1]Troy Steele is now the custodian of Petitioner and is substituted for Chuck Dwyer as a proper party respondent. See Rule 2(b), Rules Governing Section 2254.

The evidence against Petitioner included, inter alia, testimony by a firearm and tool mark examiner with the City of St. Louis Police Department identifying a cartridge as one that could be used in a .9 millimeter luger caliber semi-automatic handgun, such as a Tech-9, and identifying a photocopy of such a gun, and by another police officer who identified the same cartridge as one found in a 1988 Oldsmobile and also identified photographs of the car, the same as later shown A.L. and M.O. (Id. at 269-77, 465-69.) Testimony was also given by the police officer who met the distraught A.L. at a service station in the early morning hours of July 3, 1996, and by the police officer who had interviewed a "visibly upset and shaken" M.O. the night of August 17, 1996, and had been impressed by her detailed recollection of her attack. (Id. at 282-84, 387-88.)

A detective, Andre Watson, testified that he had released Petitioner after he had been identified in a lineup by A.L. and M.O. because the detective had been told that the identifications "were not 100 percent positive." (Id. at 514-15.) He also testified that he had asked Dolly Vance to come and be interviewed, but she had never come. (Id. at 518.) When called again as a witness in the State's case, Watson was asked to identify a "wanted poster" for Petitioner issued when the decision was made to arrest him. (Id. at 589.) Trial counsel objected to the admission of the poster, State's Exhibit 73,[2] on the grounds of relevancy and prejudice. (Id. at 590.) He noted that the poster, in addition to including a photograph already admitted, included the charges against Petitioner and argued that the

_____

[2]This poster is duplicated in Petitioner's brief in his post-conviction appeal. (Resp. Ex. I at A-2.)

jury did not need to be reminded of such.  (<u>Id.</u> at 591.)  The court found it neither irrelevant or prejudicial, but remarked that it might be cumulative.  (<u>Id.</u>)  The prosecutor disagreed, arguing that the poster should be admitted in response to Petitioner's point that he was let go after being selected in a lineup.  (<u>Id.</u>)  The exhibit was admitted.  (<u>Id.</u> at 592.)

Another detective, Matt Hanewinkel, testified that he had investigated Chester Hickman after being informed that Hickman owned a Tech-9 and had found that Hickman and Petitioner owned a car together.  (<u>Id.</u> at 522-23.)  He and another detective located a car, an Oldsmobile, owned by Hickman and impounded it.  (<u>Id.</u> at 524.)  A cartridge for a .9 millimeter weapon was found inside; and the car matched the victims' description of several odd features of the car in which they had been held, e.g., the seats were maroon, the transmission lever did not have a knob, there was no dome light, and the stereo was not factory-installed.  (<u>Id.</u> at 526-27.)  The plates on the car had been issued to an Audi registered to Hickman and Petitioner.  (<u>Id.</u> at 529.)  This car and one owned only by Petitioner had the same odd features.  (<u>Id.</u> at 538-39.)  Detective Hanewinkel also testified about the lineups from which each victim had selected Petitioner, stating that neither victim had been told that a person in the lineup was under suspicion or had been instructed to pick someone out and that an effort had been made to have the men in the lineup have similar, physical characteristics.  (<u>Id.</u> at 543-45.)  On cross-examination, Hanewinkel further testified that in the photographic spread shown A.L. and M.O. two of the men appeared to be of lighter skin than the others and, of the two, one had a heavier build.  (<u>Id.</u>

at 549-50.) Asked if Petitioner was the only one in the spread with light skin and a heavy build, he replied, "Yes." (Id. at 550.) A.L. identified Petitioner; M.O. did not. (Id.) In the lineup, Petitioner was the only one who was heavyset and of short stature. (Id. at 552.)

A registered nurse at Children's Hospital read to the jury the brief, narrative history given that night by A.L. of what had happened to her and testified that A.L. did not appear to have any physical injuries and there was no semen or spermatozoa found during her exam. (Id. at 285-93.) A criminalist with the Police Department testified that she was unable to do any DNA testing on samples taken from A.L., but a DNA analysis of seminal fluid found on M.O. and on her clothing matched the DNA of Hickman. (Id. at 293-301.) No DNA samples of Petitioner were tested. (Id. at 302.)

A.L. and M.O. both testified. Each was approached by a man when she was walking alone at night. (Id. at 312, 402-03.) A.L. testified that she told the man, who was licking his tongue at her, that she was 12 and too young. (Id. at 314.) She kept walking. (Id.) The man went to a blue, four-door car. (Id. at 313, 315.) When she crossed the street, she saw another man approach her. (Id. at 315.) She crossed back, he did too. (Id. at 316-17.) Eventually, he pulled a gun on her – she identified the photocopy of the Tech-9 as being the gun – and took her to a vacant lot. (Id. at 317-21.) The first man approached. (Id. at 322.) The man with the gun told him A.L. was 12; the first man said, "so." (Id. at 323.) The men took her back to the blue car and drove around with her. (Id. at 325.) At first, they let her sit up front. (Id.) Then the man with the gun told her to lay down in the

back.  (Id. at 327.)  The seat in the back was burgundy, a different color than the front

seat.  (Id.)

One of the men had intercourse with her and made her perform oral sex; then the other

man did.  (Id. at 329.)  Neither ejaculated.  (Id. at 330.)  She identified Petitioner as the

first man.  (Id. at 313, 330.)  A.L. further testified that she had identified Petitioner in a

line-up and then had identified Hickman in another lineup.  (Id. at 332.)  Shown a lineup

picture, she identified Petitioner as someone in the lineup, but did not recall if that was the

lineup from which she had originally picked him.  (Id. at 333-34.)  She also identified

pictures of a car and its interior as the car in which she was attacked.  (Id. at 334-37.)

Trial counsel questioned A.L. on cross-examination about her opportunity to see

Petitioner, including the lighting and his proximity to her.  (Id. at 362-80.)  He then asked

her about her pretrial identification.  (Id. at 381.)  She replied that she was sure when she

identified Hickman in a lineup.  (Id. at 382.)  She was not very sure when she identified

Petitioner in a lineup, but was sure when she selected his photograph.  (Id.)  On a scale

from one to ten, with ten being very sure that her assailant was the man she picked out in

the lineup, her certainty then about selecting Petitioner was a "one."  (Id. at 382-83.)

When now asked about how sure she was that Petitioner was one of her assailants, her

certainty was a "ten."  (Id. at 383.)  The following exchange occurred:

> [Trial counsel]:  . . . Now, why are you saying that this is a 10 when in the
> lineup you only thought it was a one?
>
> [Prosecutor]:  Objection, argument.

The Court: Sustained.

[Trial counsel]: What is it about looking at him now that makes you more sure?

[Prosecutor]: Objection. That's the same question, its' argumentative.

The Court: Sustained.

[Trial counsel]: Are you more sure than you were at the lineup?

[Prosecutor]: Objection, it's still argumentative, it's the same kind of question.

[Trial counsel]: I'm asking her if she's more sure.

The Court: It's argumentative.

      . . . .

The Court: It's analogous to asking her did you lie then or did you lie now. One case has held as argumentative, that's why I'm sustaining the objection.

[Trial counsel]: Well, basically I'm trying to get at the reasons why.

The Court: You can get the reasons why she's as confident as she is today about her identification, but you can't compare this statement to the last statement.

[Trial counsel]: Okay, that's fine.

The Court: Do it during your argument.

(Id. at 383-84.)

M.O. described a similar chain of events as related by A.L. (Id. at 400-25.) M.O., however, had a T-shirt placed over her head when she was put in the car and was told to lay down behind the driver's seat and keep her face covered. (Id. at 415-16.) She pulled the shirt back a little so she could see. (Id. at 417.) When they stopped in an isolated

area, the man she identified as Petitioner took the T-Shirt off her head and told her to take off her pants. (<u>Id.</u> at 419.) While she laid on her back, he tried twice to have sex with her, the second time he did. (<u>Id.</u> at 421-23.) Even though it was dark, she could see his face. (<u>Id.</u> at 421.) As did A.L., M.O. identified photographs of a car as the one in which she was attacked. (<u>Id.</u> at 440-41.) She further testified that she had not picked anyone out of one lineup, but had picked Hickman out of a second lineup the month after her attack. (<u>Id.</u> at 442-43. ) The next month, she picked Petitioner out of another lineup. (<u>Id.</u> at 445.)

Petitioner called one witness, Dolly Vance. (<u>Id.</u> at 607-51.) She testified that she could remember July 2, 1996, because she received her aid check that day. (<u>Id.</u> at 609.) Petitioner was with her after she picked him up at work at approximately 3:00 in the afternoon until the next morning. (<u>Id.</u> at 610-14.) He was also with her the afternoon and night of August 17. (<u>Id.</u> at 614-16.) On cross-examination, she was asked about inconsistencies in what she had told the prosecutor the previous Friday about what she cooked for dinner on July 2 and what she had just testified to and about when she had cashed her check. (<u>Id.</u> at 634-35, 638, 642-45.) She also testified that Petitioner was with her every night in June, July, August, and September of 1996. (<u>Id.</u> at 639.)

Petitioner did not testify.

After two hours of deliberation, the jury returned a verdict of guilty on each count. (Resp. Ex. B at 5.) Petitioner was later sentenced to two terms of life imprisonment on the rape charges, two terms of six years' imprisonment on the armed criminal action

charges, and two terms of fifteen years' imprisonment on the kidnapping charges, with each sentence to run consecutively to the other five. (Id. at 99-101.)

Petitioner appealed on two grounds: that first, he was denied due process and a fair trial when the trial court did not suppress the victims' in-court identification of him because such was tainted by suggestive law enforcement procedures and, second, he was denied the right to confront the witnesses against him, due process, and a fair trial when the trial court refused to allow him to impeach or cross-exam A.L. on her inconsistent statements about her certainty that he was her attacker. (Resp. Ex. C.) Because neither issue had been properly preserved in the trial court, each was presented for plain error review. (Id.) The appellate court found each to be without merit. (Resp. Ex. E.)

> . . . [T]he procedures employed by the police, specifically the two photo line-ups and the two live line-ups, were not impermissibly suggestive. Appellant bases his argument on alleged dissimilarities among the men in the line-ups. We have reviewed the photo line-ups and photographs of the live line-ups. All of the line-ups were composed of African-American men with physical attributes similar, strikingly in some cases, to Appellant's. Even if we accept the fact that there were minor dissimilarities among the subjects of the line-up, dissimilarity alone is insufficient to establish impermissible suggestiveness, for a line-up does not require exact conformity. We require only reasonable efforts of police investigators to find physically similar participants for a photographic line-up.
>
> The police went beyond a "reasonable effort to harmonize" the subjects in the photo line-ups and the live line-ups in this case. . . .
>
> Appellant next claims the trial court committed plain error when it sustained the State's objections to certain questions during cross examination of one of the victims regarding her identification of Appellant. . . . We find the trial court did not abuse its discretion.

- 8 -

(Id. at [2]-[3].) (Alterations added; interim citations omitted).

Petitioner then moved for post-conviction relief. (Resp. Ex. H at 3-38.) His motion was amended by counsel. (Id. at 39-56.) At an evidentiary hearing, his trial counsel was asked why he did not point out to the trial court that there were two crimes listed on the "wanted" poster that Petitioner had not been charged with, i.e, child molestation and sodomy. (Resp. Ex. G at 22.) Trial counsel could not recall. (Id.) He also could not think of a strategic reason for not pointing out the discrepancy. (Id.) Trial counsel further testified that a large part of his strategy was unexpectedly altered when Petitioner decided not to testify. (Id. at 23.) Petitioner's counsel on direct appeal testified that she did not challenge the admission of the poster on appeal and did not have a strategic reason for not doing so. (Id. at 41.) She now thought she should have. (Id. at 41-42.)

The court denied Petitioner relief. (Resp. Ex. H at 66-71.) Addressing Petitioner's claims about the "wanted" poster, the court held:

> Movant claims defense counsel failed to adequately object to the admission of a wanted poster which indicated in small print that he was wanted for "Forcible Rape, Sodomy, Kidnapping, A.C.A., Child Molestation." He also claims appellate counsel was ineffective for failing to raise the issue on appeal. The prosecutor argued the poster's relevance at trial contending the same picture had already been shown, and that the poster was a part of the police investigation into the crimes involved in this case. The Court found the relevance of the poster was "minuscule" but that any prejudice was "not existent." Movant contends he was not charged with child molestation or sodomy and that the poster was prejudicial as containing evidence of other crimes. In fact, movant was charged with two counts of forcible rape, two counts of kidnapping, two counts of armed criminal action and sexual abuse.[3] The Court believes any possible prejudice is highly unlikely considering the

_____

[3]This count was dismissed by the trial court at the conclusion of the evidence.

size of the print and the fact that neither the Court nor the parties noticed the discrepancy. In addition, the actual crimes charged were at least as serious in degree and number if not more so than those listed on the wanted poster.

(Id. at 70-71.)

Petitioner appealed, arguing that his trial counsel was ineffective for failing to object to Exhibit 73 on the grounds that it included impermissible references to uncharged crimes and his appellate counsel was ineffective for failing to raise the claim on direct appeal. (Resp. Ex. I at 10.) Again, the appellate court denied relief, finding, in relevant part, as follows:

Movant argues he was prejudiced by the admission of the wanted poster into evidence because it lead the jury to believe he had committed additional crimes other than the ones for which he was on trial. In order to prove prejudice, movant must show a reasonable probability that but for the errors of counsel, the outcome of the proceeding would have been different.

Movant failed to meet his burden to show that he was prejudiced by the admission of the wanted poster into evidence. Evidence supporting all the charges listed on the wanted poster combined with overwhelming evidence of movant's guilt indicates that movant was not prejudiced by the admission of the wanted poster into evidence. Twelve-year-old [A.L.] testified that she was not only raped by movant and Hickman, but they both forced her to "suck [their] privacy part." [A.L.] and [M.O.] identified movant's car, he was identified by the girls in a police lineup, and he implicated himself to the police when he was questioned. As mentioned below, the list of crimes on the wanted poster was in small print, and neither the parties nor the court noticed the uncharged crimes on the poster during the trial. We do not believe that the outcome of movant's trial would have been different if the wanted poster had not been admitted into evidence.

. . . Movant's trial counsel did object to the admission of the wanted poster into evidence on the ground that it was irrelevant, because it was duplicative of other evidence since [A.L.] and [M.O.] had just described the crimes in their trial testimony. This objection did not involve the uncharged crimes listed on the poster. In fact, neither the court nor the parties recognized

that uncharged crimes were listed on the wanted poster. . . . All the crimes listed on the wanted poster were in small print and involved possible charges arising out of the rapes of [A.L.] and [M.O.]. The police charged movant with rape, armed criminal action, and kidnapping. As mentioned above, there was evidence to support the uncharged crimes of sodomy and child molestation in the record and overwhelming evidence of movant's guilt. Thus, even if a meritorious objection could have been made on the grounds that the posture listed uncharged crimes, the failure to make such an objection did not deprive movant of a fair trial.

. . . Trial counsel was not ineffective for failing to object to the wanted poster on grounds that it contained uncharged crimes, as discussed above, and movant was not prejudiced by the failure. Therefore, we cannot consider appellate counsel ineffective for failing to request plain error review of that issue. . . .

(Id. at 4-6.) (All but second alteration added.)

Petitioner now raises the three grounds presented to the state appellate courts as grounds for federal habeas relief. Respondent contends each is without merit.[4]

## **Discussion**

Standard of Review. Title 28 U.S.C. § 2254(d) mandates that a federal court "not grant habeas relief on a claim that was adjudicated on the merits in state court unless 'it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" **James v. Bowersox**, 187 F.3d 866, 869 (8th Cir. 1999) (quoting § 2254(d)(1)), or it "'resulted in a decision that was based on an unreasonable determination of the facts

---

[4]Respondent initially argued that the petition was untimely filed. This argument was rejected on the grounds of **Pierson v. Dormire**, 484 F.3d 486, 493-95 (8th Cir. 2007). Respondent notes that the Eighth Circuit Court of Appeals has granted rehearing en banc on the timeliness issues resolved in **Pierson**. The possibility that a future en banc decision might change the **Pierson** holdings does not allow for a revisiting of those issues in the instant case.

in light of the evidence presented in the State court proceeding,'" **Evans v. Rogerson**, 223 F.3d 869, 871 (8th Cir. 2000) (quoting § 2254(d)(2)). <u>See also</u> **Weaver v. Bowersox**, 241 F.3d 1024, 1029 (8th Cir. 2001) ("Section 2254(d) distinguishes between two types of erroneous decisions – those of law and those of fact[.]").

The "contrary to" clause and the "unreasonable application" clause have independent meanings. **Williams v. Taylor**, 529 U.S. 362, 405 (2000). "[A] state court decision is 'contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent.'" **Lockyer v. Andrade**, 538 U.S. 63, 73 (2003) (quoting <u>Williams</u>, 529 U.S. at 405-06) (alterations added). "On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." **Williams**, 529 U.S. at 406 (alteration added). Thus, a state court decision that correctly identifies the controlling legal authority and, applying that authority, rejects a prisoner's claim does not fit within the "contrary to" clause although it might be contrary to a federal court's conception of how that authority ought to be applied in that particular case. **Id.**

Such a state court decision can, however, fit within the "unreasonable application" clause. **Id.** at 407-08. "[W]hen a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may

conclude that the state-court decision falls within that provision's 'unreasonable application' clause." **Id.** at 409 (alterations added). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." **Id.** (alteration added). When making this inquiry, a federal habeas court should note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." **Id.** at 410. "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." **Lockyer**, 538 U.S. at 75 (internal quotations omitted). And, "'[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness . . . of the state court's treatment of the contested issue.'" **Copeland v. Washington**, 232 F.3d 969, 974 (8th Cir. 2000) (quoting Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999)) (alterations in original). Additionally, "the [state courts'] 'summary nature' of the discussion of [a] federal constitutional question does not preclude application of the AEDPA standard." **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (alterations added).

Identification. Petitioner first argues that his constitutional rights were violated when the trial court failed to suppress A.L.'s and M.O.'s in-court identification of him because each was the result of tainted and suggestive law enforcement procedures.

"A conviction based on eyewitness identification at trial will be set aside only when pre-trial identification procedures were so impermissibly suggestive that they give rise to

a very substantial likelihood of irreparable harm." **Trevino v. Dahm**, 2 F.3d 829, 833 (8th Cir. 1993). Accord **Palmer v. Clarke**, 408 F.3d 423, 435 (8th Cir. 2005). "'Reliability is the linchpin in determining the admissibility of identification testimony[.]'" **United States v. Davis**, 103 F.3d 660, 669 (8th Cir. 1996) (quoting Manson v. Brathwaite, 432 U.S. 98, 113 (1977)) (alterations added). "The factors to be considered in the Court's analysis of the reliability of identification testimony are the witness's opportunity to view the defendant at the time of the crime, the witness's degree of attention at the time of the crime, the accuracy of the witness's prior description, the witness's level of certainty at the line-up, and the length of time between the crime and the line-up." **United States v. Fields**, 167 F.3d 1189, 1190 (8th Cir. 1999). The totality of these factors is then weighed "against 'the corrupting effect of the suggestive identification itself' to determine whether suppression is warranted." **Davis**, 103 F.3d at 670 (quoting Manson, 432 U.S. at 114). And, "[w]hether an identification was reliable is a question of fact," the state courts' determination of which is to be accorded "a high measure of deference." **Mack v. Caspari**, 92 F.3d 637, 642 (8th Cir.1996) (alteration added). Accord **Palmer**, 408 F.3d at 435-36.

Both victims had an opportunity to view Petitioner. Each testified to a chain of events that occurred over the course of at least one hour. He was within a few feet of each for the majority of that time, and, when raping each, was close to her face. Although each testified that it was either dark or her vision was obscured for part of the time, each also testified that she had sufficient opportunities to view her assailants. See **Collins v.**

**Dormire**, 240 F.3d 724, 727-28 (8th Cir. 2001) (finding eyewitness's identification of defendant to be reliable, eyewitness had stood five to six feet away from defendant for a few minutes). Each selected Petitioner in a line-up, either live or photographic, within three months of being attacked. See **Mack**, 92 F.3d at 642 (finding identification by victim reliable, although victim had been drinking and using amphetamines and the assault was outside in the predawn hours, the defendant had been only two feet away from defendant at one point and victim had confronted defendant at trial only six months after line-up). The state court's finding that the men in those line-ups had similar, physical characteristics of Petitioner is presumed to be correct. Moreover, neither victim was told to pick anyone out of that line-up. See **Fitzgerald v. Armontrout**, 963 F.2d 1062, 1063 (8th Cir. 1992) (rejecting habeas challenge to identification of petitioner by eyewitnesses who were not told by police to pick a specific person from line-up). "'[A]ny remaining concerns about the suggestiveness of the identification procedure or the reliability of the out-of-court identification were for the jury to resolve,'" **Mack**, 92 F.3d at 643 (quoting Dodd v. Nix, 48 F.3d 1071, 1075 (8th Cir. 1995)) (alteration added), which the jury in Petitioner's case did.

Cross-Examination. Petitioner next challenges the trial court's refusal to allow his trial counsel to impeach or cross-exam A.L. about her inconsistent degree of certainty in identifying him. Although the trial court had permitted counsel to inquire of A.L. why she was then so confident that Petitioner was one of her assailants, it did not permit him to specifically compare her current certainty to a previous uncertainty at a live line-up.

An essential purpose of the Confrontation Clause "'is *to secure for the opponent the opportunity of cross-examination*.'" **Delaware v. Van Arsdall**, 475 U.S. 673, 679 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 315 (1974)). "[O]ne goal of effective cross-examination is to impeach the credibility of opposing witnesses." **Newton v. Kemna**, 354 F.3d 776, 781 (8th Cir. 2004) (alteration added). Thus, "'the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.'" **Id.** (quoting Davis, 415 U.S. at 316). "The Supreme Court has emphasized that 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" **Id.** (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)).

Although the focus of the Confrontation Clause is on individual witnesses, **Delaware**, 475 U.S. at 680, Confrontation Clause violations are subject to a harmless-error analysis, **id.** at 684. See also **Sexton v. Kemna**, 278 F.3d 08, 814-15 (8th Cir. 2002) (holding that any error in restricting cross-examination was harmless given that petitioner could have placed evidence sought to be elicited through testimony of another witness and that jury credited victim's testimony despite defense efforts attacking her credibility). Because the state appellate court spoke of abuse of discretion and did not specify whether it was applying the harmless-beyond-a-reasonable-doubt standard of Chapman v. California, 386 U.S. 18 (1967), the Court will apply such standard in reviewing Petitioner's claim. See **Middleton v. Roper**, 455 F.3d 838, 857 (8th Cir. 2006); **Barrett**

**v. Acevedo**, 169 F.3d 1155, 1164 (8th Cir. 1999) (en banc).  In determining whether such error exists, the Court "consider[s] the importance of the witness's testimony to the entire case, whether the testimony was cumulative, whether corroborating or contradicting evidence existed, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case against [Petitioner]."  **Middleton**, 455 F.3d at 857 (alterations added).

Clearly, A.L.'s testimony about identifying Petitioner was important.  However, earlier questioning of A.L. had established that she was not certain she was selecting her assailant when she had originally picked Petitioner out of a live lineup.  See **United States v. Drapeau**, 414 F.3d 869, 875 (8th Cir. 2005) (holding that "[t]he ability of the defendant to achieve through other means the effect that the excluded examination allegedly would have produced is a factor indicating that his right to confrontation was not violated").  And, the trial court permitted trial counsel to otherwise inquire about her current confidence.   Cf.  **United States v. Love**, 329 F.3d 981 (8th Cir. 2003) (finding Confrontation Clause violation was not harmless when trial court prohibited defense counsel from inquiring into impaired memory problem of only witness who saw defendant – on trial for federal firearm violation – in possession of firearm).  Moreover, the prosecution had a strong case against Petitioner.[5]  His car, with unique features, was

_____

[5]Petitioner argues in his traverse that he is innocent and that he never told anyone that he was guilty or was driving the car with Hickman.  Attached is a copy of a May 2002 letter from post-conviction counsel to the motion court that further testing on men's underwear found in the trunk of the car had failed to reveal any DNA of the second perpetrator.  Neither the attached letter nor Petitioner's traverse, with denials that he did not make at trial, are relevant to the issue of the

identified by both victims; he was identified by both victims; and his damaging statements to his employer, e.g., that he was in trouble, had been "driving the car," and could "get 50 to 60 years," Respondent's Exhibit A at 581, were never explained by Petitioner as promised by trial counsel in his opening statement.  See e.g. **Middleton**, 455 F.3d at 857 (finding harmless error when, inter alia, objected-to testimony was corroborated by other evidence and remaining evidence of petitioner's guilt was significant); **Harrington v. State of Iowa**, 109 F.3d 1275, 1279 (8th Cir. 1997) (finding harmless error in limiting cross-examination intended to test witness's memory when scope of cross-examination that was allowed, combined with overwhelming evidence against petitioner, established such error beyond a reasonable doubt).

Ineffective Assistance of Trial Counsel.  Petitioner argues that he was denied the effective assistance of trial counsel by counsel's failure to object to the admission of the "wanted" poster on the grounds that it included a reference to two crimes, child molestation and sodomy, with which he had not been charged.

"The right to effective assistance of counsel 'is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process.'" **Smith v. Rogerson**, 171 F.3d 569, 572 (8th Cir. 1999) (quoting Kimmelman v. Morrison, 477 U.S. 365, 374 (1986)).  "'The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [relevant proceeding] cannot be relied on as having produced

strength of the evidence before the jury of Petitioner's guilt.

a just result.'" **Jackson v. Gammon**, 195 F.3d 349, 354 (8th Cir. 1999) (quoting <u>Kellogg</u> <u>v. Skon</u>, 176 F.3d 447, 452 (8th Cir. 1999)) (first alteration added; second in original). "Only reasonable competence, the sort expected of the ordinary fallible lawyer, is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (internal quotations omitted). Moreover, "[t]here is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy." **Garrett v. Dormire**, 237 F.3d 946, 949-50 (8th Cir. 2001) (alteration added).

To establish that counsel's lack of competence violated the Sixth Amendment, the petitioner must show that counsel's performance was deficient and prejudicial. **Kellogg**, 176 F.3d at 452. To establish that counsel's performance was deficient, a petitioner must show that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" **Greiman v. Thalacker**, 181 F.3d 970, 971 (8th Cir. 1999) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" **Id.** (quoting <u>Strickland</u>, 466 U.S. at 697). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" **Carroll v. Schriro**, 243 F.3d 1097, 1100 (8th Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 694). "'In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'" **Lawrence v. Armontrout**, 31 F.3d 662, 666 (8th Cir. 1994) (quoting <u>Strickland</u>, 466 U.S. at 695). The burden of showing a reasonable

probability is the petitioner's. **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir. 1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. See **Strickland**, 466 U.S. at 697; **Hoon v. Iowa**, 313 F.3d 1058, 1061 (8th Cir. 2002); **Siers v. Weber**, 259 F.3d 969, 974 (8th Cir. 2001). Thus, if a petitioner has failed to show that, but for an allegedly deficient performance by his trial counsel, there is a reasonable probability that the outcome of his trial would have been different, his claim of ineffective assistance of counsel fails. **Morales v. Ault**, 476 F.3d 545, 550 (8th Cir. 2007).

Petitioner cannot establish that the outcome of his trial would have been different if only trial counsel had objected to the "wanted" poster on the grounds of uncharged crimes. First, the motion court, who had also presided over the trial, noted that the print of the crimes was so small that the court, the prosecutor, and trial counsel had not noticed the inclusion of the two uncharged crimes. Second, as also noted by the motion court, the jury heard evidence that Petitioner had forced A.L. to commit oral sex – an element of both second degree sodomy, Mo.Rev.Stat. § 566.064 (defining second degree sodomy as deviate sexual intercourse, including oral sex, by a person at least twenty-one years' old with a person who is less than seventeen years' old), and child molestation, Mo.Rev.Stat.

§ 566.067 (defining first degree child molestation as the subjection of a person who is less than fourteen years of age to sexual contact).

As noted above, to prevail on his ineffective assistance of counsel claim, Petitioner "must do more than show that he would have satisfied <u>Strickland's</u> test if his claim were being analyzed in the first instance[.]" **Bell v. Cone**, 535 U.S. 685, 698-99 (2002) (alteration added). Under § 2254(d), "he must establish that the state court 'applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner.'" **Skillicorn v. Luebbers**, 475 F.3d 965, 973 (8th Cir. 2007). For the foregoing reasons, Petitioner has not made this showing. <u>Cf.</u> **Manning v. Bowersox**, 310 F.3d 571, 577 (8th Cir. 2002) (finding prejudice in trial counsel's failure to object to inadmissible testimony that petitioner had attempted to create a false alibi defense)

<u>Ineffective Assistance of Appellate Counsel.</u> Petitioner also challenges as a denial of his Sixth Amendment right to the effective assistance of counsel his appellate counsel's failure to raise in his direct appeal the issue of the uncharged crimes on the poster.

It is well established that the Sixth Amendment guarantees the right to effective assistance of counsel on direct appeal. <u>See</u> **Douglas v. California,** 372 U.S. 353, 358 (1963). To succeed on a claim of ineffectiveness of counsel on direct appeal, Petitioner must show, first, that appellate counsel's performance was below the reasonable standard of competence and, second, a reasonable probability that the result would have been different absent this deficient performance. <u>See</u> **Strickland,** 466 U.S. at 687; **Gee v. Groose**, 110 F.3d 1346, 1352 (8th Cir. 1997).

Assuming, without deciding, that appellate counsel's omission of the uncharged crimes issue reflected a deficient performance, Petitioner has not established that the result of his appeal would have been different.

Because trial counsel had failed to object to the poster on the grounds of uncharged crimes, the appellate court would have reviewed a challenge to its admission for plain error. See **State v. Woodmansee**, 203 S.W.3d 287, 292 (Mo. Ct. App. 2006). Plain error review is a two-step process. **Id.** The first step is a determination, "based on the facts and circumstances of each case," whether the error is "evident, obvious, and clear." **Id.** Clearly, the error in the instant case is not. As noted by the state trial court, the inclusion of the uncharged crimes was so far from obvious that neither counsel nor the court noticed it. It was also neither evident nor clear that the inclusion, had it been noticed, was error because the jury had heard evidence that would have been relevant to both crimes. Lacking plain error, the second step of the process – whether manifest injustice resulted – is not to be reached. **Id.**

## Conclusion

For the foregoing reasons, the state courts' resolution of Petitioner's three § 2254 claims is not contrary to clearly established Federal Law, is not an unreasonable application of such law, and is not an unreasonable determination of the facts. Consequently, these claims are unavailing. Accordingly,

**IT IS HEREBY RECOMMENDED** that the 28 U.S.C. § 2254 petition of Richard Green be **DENIED** without further proceedings.

The parties are advised that they **up to and including August 8, 2007**, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. <u>See</u> **<u>Griffini v. Mitchell</u>**, 31 F.3d 690, 692 (8th Cir. 1994).

<u>/s/ Thomas C. Mummert, III</u>
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>27th</u> day of July, 2007.